# IN THE SUPREME COURT OF IOWA

No. 08–0519

Filed December 23, 2010

**STATE OF IOWA,**

    Appellee,

vs.

**WAYNE SAMUEL BARNES,**

    Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Calhoun County, Joel E. Swanson, Judge.

State seeks further review of court of appeals' decision reversing defendant's conviction for burglary and theft on ground trial counsel was ineffective in failing to request a corroboration instruction. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, and Cynthia L. Voorde, County Attorney, for appellant.

Mark C. Smith, State Appellate Defender, and Patricia A. Reynolds, Assistant State Appellate Defender, for appellee.

**TERNUS, Chief Justice.**

The State seeks further review of a court of appeals' decision reversing the defendant's conviction for burglary in the third degree and theft in the second degree, both as a habitual offender, on the ground trial counsel was ineffective in failing to request a corroboration instruction. Because we agree the defendant failed to establish that, had the instruction been given, a reasonable probability existed the outcome would have been different, we vacate the decision of the court of appeals and affirm the judgment of the district court.

## I. Background Facts and Proceedings.

From the evidence presented at trial, a jury could find the following facts. In March 2006, the defendant, Wayne Samuel Barnes, bought six to eight pigs with the intent to raise them and sell them. His sister, Annette Bellcock, and her husband, James Bellcock, allowed the defendant to keep the pigs at an acreage they owned in rural Calhoun County. In return, the defendant agreed to give the Bellcocks one pig when the pigs were ready for market. No one lived at the Bellcocks' acreage, but there were several outbuildings on the property and the Bellcocks kept horses there.

The defendant cared for the pigs until sometime in May when he abandoned them and moved to Kansas. The defendant did not contact the Bellcocks, and they did not know where he had gone. James assumed care of the pigs for about a month and then, tired of the effort and expense of raising the pigs, sold them in June 2006.

In March 2007, the defendant moved back to Iowa from Kansas with his girlfriend, Brandi Rex. The couple moved in with seventeen-year-old Brian Sayer and his mother.

On April 6, 2007, the Bellcocks discovered the riding lawn mower they kept on the acreage had been stolen. The lawn mower had been stored in a

machine shed on the property. The key for the lawn mower was locked up at the Bellcocks' residence. Prior to these events, the sliding door on the shed had been blown off by the wind, so James had moved a large farm tractor in front of the door so nothing could be driven out of the building. It appeared the mower had been removed through an opening in a wall of the shed where someone had taken off a piece of the wall. The machine shed was approximately one hundred feet from the building where the defendant had been raising pigs. The lawn mower had been purchased in late March or April of 2006, about the same time Barnes started housing pigs at the acreage. James last recalled seeing the mower on April 3, 2007. A tire and rim for a pickup truck parked outside the shed were also missing.

Approximately two months later, on June 6, 2007, a deputy county sheriff received information that led him to a pawnshop in Ames, Iowa. Records obtained from the pawnshop revealed that, on April 4, 2007, Rex pawned a riding lawn mower fitting the description of the one taken from the acreage. At the same time, Rex pawned a video game system and some games. Rex's signature and fingerprint were contained on the paperwork completed for these transactions.

A former employee of the pawnshop recalled that two people brought the lawn mower into the pawnshop, a male and a female. The female identified herself as Brandi Rex and was the person who signed the paperwork. The former employee estimated the woman was in her late twenties or early thirties and the male was ten to fifteen years older than the woman, though he could not identify the defendant when he saw the defendant at his deposition. At trial, Rex testified she was twenty-eight. The defendant was thirty-nine.

The riding lawn mower was subsequently sold to Eric Dalaba on June 5, 2007, and was retrieved by the deputy sheriff on June 7. James

Bellcock positively identified the lawn mower as the one taken from his machine shed.

At trial, several witnesses presented testimony tending to connect Barnes to the lawn mower's disappearance. Douglas Geibe testified that he had known the defendant for about a year and a half and that, in the spring or summer of 2007, Barnes was at Geibe's residence when a discussion about a lawn mower ensued. According to Geibe, they were sitting around talking when Geibe mentioned he needed a new lawn mower. Barnes, Geibe testified, told him he had access to a lawn mower that he was going to be picking up the next day and asked if Geibe was interested in it. Barnes told Geibe he was getting the lawn mower from his sister in payment for a debt she owed him on some hogs she had sold. Although Geibe indicated he was interested in the lawn mower and asked Barnes to bring it over, he testified Barnes never did, and he had no further discussions with the defendant about any lawn mowers.

Rex also testified at the defendant's trial. According to Rex, between March and August 2007, she was living in Lake City, Iowa, and dating the defendant. During this period, she claimed the defendant talked about his sister and said "[n]ot very good things." In particular, he told Rex that his sister had sold some hogs that cost him $1600, and he acted "real mad" about it. He also made comments about wanting to burn down his sister's house. He made those statements, according to Rex, before the lawn mower was stolen. Rex stated Barnes told her about the lawn mower the Bellcocks had at their farm.

Rex further testified that, on April 4, 2007, she was with the defendant and Sayer when they retrieved a riding lawn mower from a farm near Lake City where the defendant had left it the previous night. The lawn mower was in a truck covered with a blue tarp. Defendant initially told Rex

he had obtained the lawn mower in trade for some tattoo work he had done. They took the lawn mower to the Ames pawnshop where Rex signed the necessary paperwork, asserting she was the owner of the lawn mower, because she was the only one with a valid identification card. She testified Barnes was standing by her while she took care of the sale. She also pawned Sayer's game system because he was underage and could not pawn it himself.

After the lawn mower was pawned, Rex testified Barnes informed her the lawn mower was stolen. She recalled the defendant told her he had knocked a couple of boards out of the back wall of the shed to remove the lawn mower because the doorway of the shed was blocked by a tractor. Based upon her involvement in pawning the lawn mower, Rex was charged with theft and burglary. As part of a plea agreement, Rex testified she pleaded guilty to tampering with records and received a suspended sentence in exchange for agreeing to testify at the defendant's trial.

Sayer also testified at the defendant's trial. According to Sayer, the night before he accompanied the defendant and Rex to the pawnshop, he and Barnes and a number of other people were at Sayer's house drinking beer. During the evening, Barnes approached him and asked him to help him steal a lawn mower. Sayer refused. After finding someone else to help him, Barnes left the gathering in his truck. When he returned about an hour and a half later, he told Sayer his truck was parked at one Dilly's farm about four miles north of Lake City and that they had gotten the lawn mower. Later that evening, Barnes asked Sayer if he wanted to help him pawn the lawn mower, and Sayer agreed.

The next morning Sayer took Barnes and Rex out to the Dilly farm where the truck with the lawn mower had been left. The lawn mower was in back, covered with a blue tarp. On the way to the pawnshop, they stopped

at a hardware store to obtain a key, as Barnes told Sayer he didn't have a key to the lawn mower. Sayer testified he walked around the pawnshop while Rex pawned the lawn mower and that Barnes stood by Rex while she completed the paperwork.

On January 17, 2008, the jury found the defendant guilty of burglary in the third degree and theft in the second degree. They also found the defendant had two prior felony convictions. The court denied the defendant's motion for new trial. Barnes received an indeterminate fifteen-year sentence on each count. The sentences were ordered to be served consecutively.

**II. Issues on Appeal.**

Barnes raises three issues on appeal. First, Barnes asserts trial counsel was ineffective for eliciting and for failing to object to evidence of other bad acts and for failing to request the jury receive an instruction on the requirement of corroboration of accomplice testimony. Second, the defendant claims the trial court applied the wrong standard to his motion for new trial and erred in failing to grant the motion. Third, Barnes asserts the court erred in imposing consecutive sentences without giving any reason for doing so.

We transferred the case to the court of appeals. Initially, the court of appeals issued an order remanding the defendant's case to the district court for reconsideration of the defendant's motion for new trial. The district court found that defendant's conviction was not contrary to the weight of the evidence.[1] On the merits, the court of appeals reversed and remanded the case for a new trial on the ground trial counsel was ineffective for failing to

---

[1]The defendant has not further challenged that finding, and therefore, we give the defendant's claim that the trial court applied the wrong standard on his motion for new trial no further consideration.

request a corroboration instruction. The State filed an application for further review, which we granted.

### III. Ineffective-Assistance-of-Counsel Claims.

To prevail on an ineffective-assistance-of-counsel claim, a defendant must show: "(1) counsel failed to perform an essential duty; and (2) prejudice resulted." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). Normally ineffective-assistance-of-counsel claims are brought in postconviction relief actions. "We will address such claims on direct appeal only if we determine the development of an additional factual record would not be helpful and one or both of these elements can be decided as a matter of law." *State v. Dudley*, 766 N.W.2d 606, 620 (Iowa 2009).

Proof of the first prong of this claim requires a showing that counsel's performance fell outside the normal range of competency. *Id.* " 'Trial counsel's performance is measured objectively by determining whether counsel's assistance was reasonable, under prevailing professional norms, considering all the circumstances.' " *State v. Vance*, 790 N.W.2d 775, 785 (Iowa 2010) (quoting *State v. Lyman*, 776 N.W.2d 865, 878 (Iowa 2010)).

Proof of the second prong requires a showing by the defendant of a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. *State v. Artzer*, 609 N.W.2d 526, 531 (Iowa 2000). "In determining whether this standard has been met, we must consider the totality of the evidence, what factual findings would have been affected by counsel's errors, and whether the effect was pervasive or isolated and trivial." *State v. Graves*, 668 N.W.2d 860, 882–83 (Iowa 2003) (citing *Strickland v. Washington*, 466 U.S. 668, 695–96, 104 S. Ct. 2052, 2069, 80 L. Ed. 2d 674, 698 (1984)). "[I]t is the defendant's burden to demonstrate a reasonable probability of a different result." *State v. Reynolds*, 746 N.W.2d 837, 845 (Iowa 2008).

**A. Failure to Request Corroboration Instruction.** Barnes contends he received ineffective assistance because trial counsel failed to request a jury instruction on corroboration of accomplice testimony. He contends both Rex and Sayer were accomplices and the jury should have been instructed that their testimony must be independently corroborated.

1. *Underlying principles.* The rules related to jury instructions in civil cases also apply to the trial of a criminal case. Iowa R. Crim. P. 2.19(5)(*f*). "Therefore, the court is required to 'instruct the jury as to the law applicable to all material issues in the case.' " *State v. Shanahan*, 712 N.W.2d 121, 141 (Iowa 2006) (quoting Iowa R. Civ. P. 1.924).

Iowa Rule of Criminal Procedure 2.21(3) provides:

> A conviction cannot be had upon the testimony of an accomplice or a solicited person, unless corroborated by other evidence which shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.

We have defined an accomplice as " 'a person who willfully unites in, or is in some way concerned in the commission of a crime.' " *State v. Berney*, 378 N.W.2d 915, 917 (Iowa 1985) (quoting *State v. Johnson*, 318 N.W.2d 417, 440 (Iowa 1982)). In general, a person is an accomplice if he or she could be charged and convicted of the same offense for which the defendant is on trial. *Id.*; *accord State v. Douglas*, 675 N.W.2d 567, 571 (Iowa 2004). It is not enough, however, to show mere knowledge of the contemplation of a crime or mere presence at the time and place of the crime; it must be established by a preponderance of the evidence the witness was in some way involved in the commission of the crime. *Douglas*, 675 N.W.2d at 571. When the facts are not in dispute or susceptible to different inferences, whether a witness is an accomplice is a question of law for the

court.  *Id.*  However, where the facts are disputed or susceptible to more than one interpretation, the question is one for the jury.  *Id.*

The requirement of accomplice corroboration serves two purposes:

[I]t tends to connect the accused with the crime charged, and it serves as a counterweight against the dubious credibility of an accomplice, whose motivation to testify is suspect because the person would have a natural self interest in focusing the blame on the defendants.

*Berney*, 378 N.W.2d at 918.  "Corroborative evidence need not be strong as long as it can fairly be said that it tends to connect the accused with the commission of the crime and supports the credibility of the accomplice."  *Id.*  However, "the testimony of one accomplice may not corroborate the testimony of another accomplice."  *Douglas*, 675 N.W.2d at 572.

2.  *Analysis.*  We assume, without deciding, that Rex and Sayer met the definition of accomplices, thereby triggering counsel's duty to ask for a corroboration instruction, and focus instead on whether Barnes was prejudiced by counsel's failure to request a corroboration instruction.  *See State v. Lane*, 743 N.W.2d 178, 184 (Iowa 2007) (noting the court may dispose of an ineffective-assistance-of-counsel claim if the defendant fails to meet either the duty or the prejudice prong).  Based upon the evidence, Barnes has failed to meet his burden of demonstrating there was a reasonable probability of a different result if counsel had requested, and the jury had been given, an accomplice instruction.[2]

We begin with the testimony of the alleged accomplices:  Rex and Sayer.  According to Rex, she was Barnes' girlfriend, and she accompanied Barnes upon his return to Iowa in March 2007.  Rex recalled Barnes'

---

[2]There is no need to preserve this ineffective-assistance claim for further development of the record, as the determination of prejudice for this particular claim is made based on a review of the evidence introduced at trial.  Therefore, the necessary record is before us.

negative comments about his sister and that the Bellcocks kept a lawn mower on their property. Rex testified that she was with Barnes and Sayer when they retrieved a riding lawn mower that had been taken from the Bellcocks' farm and left at Dilly's farm, already loaded in a truck and covered with a tarp, on April 4, 2007, the same day she pawned the lawn mower in Ames. She asserted Barnes was standing by her in the pawnshop while she took care of the sale. She also testified that Barnes eventually told her the lawn mower was stolen and described how he had removed the lawn mower from the shed by knocking out a couple of boards. Sayer testified that, on the way to pawn the stolen lawn mower, the group stopped at a hardware store to get a key made for the lawn mower because Barnes did not have one.

Rex's testimony connecting Barnes to the theft of the lawn mower was corroborated by the testimony of several nonaccomplices. Rex's testimony the defendant knew about the lawn mower stored at his sister's acreage is supported by the Bellcocks' testimony that the lawn mower was on the property at the same time the defendant was raising his pigs there. Rex's testimony that Barnes contended his sister owed him money is corroborated by Geibe's testimony that Barnes asserted the Bellcocks owed him money for the sale of some pigs and that Barnes was getting a mower from his sister in exchange for the debt. Her testimony that Barnes stole the lawn mower by knocking a couple of boards out of the back wall of the shed to remove the lawn mower because the doorway was blocked by a large object was corroborated by James Bellcock's testimony that a tractor blocked the doorway of the shed, a piece of the shed wall had been removed, and it appeared the lawn mower had been removed through that opening. Finally, an employee of the pawnshop testified Rex was accompanied by a man who appeared ten to fifteen years older than Rex, a description that fit Barnes but

did not fit Sayer and corroborated Rex's testimony that Barnes stood by her while she took care of the sale of the lawn mower at the pawnshop.

Sayer's testimony connecting Barnes to the theft was also corroborated. Sayer testified that, on the way to the pawnshop, they stopped to have a key made for the lawn mower because Barnes did not have a key. The fact that Barnes would not have had the key to the stolen lawn mower was supported by the testimony of James Bellcock that the key was not kept with the lawn mower, but was kept at the Bellcock residence.

We conclude the defendant has failed to establish a reasonable probability exists that, had his attorney requested a corroboration instruction, the outcome of the defendant's trial would have been different. First, given the abundant evidence corroborating the accomplices' testimonies, it is highly unlikely the jury would not have found adequate corroboration. Second, even if the jury had been properly instructed and found the corroboration insufficient, the remaining evidence was so persuasive in proving the defendant's guilt that we are not convinced there is a reasonable probability the outcome of the trial would have been different. Therefore, defendant has failed to establish that, had the jury been given an instruction on accomplice corroboration, there was a reasonable probability the jury would have come to a different conclusion regarding the defendant's guilt. The court of appeals erred in finding the defendant met his burden of establishing ineffective assistance of counsel on this issue.

**B. Eliciting and Failing to Object to the Admission of Other Bad Acts Evidence.** Barnes claims evidence of two separate other bad acts allegedly committed by him were improperly presented to the jury. The evidence involved Barnes' alleged involvement in the theft of a tire and rim from the Bellcocks' acreage and his alleged threat to burn down his sister's

house. After reviewing the underlying principles governing the admissibility of other bad acts evidence, we shall address each instance in turn.

1. *Underlying principles.* Iowa Rule of Evidence 5.404(*b*) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Thus, while other bad acts are inadmissible to show a defendant's propensity for criminal conduct, they may be admissible if offered for an appropriate purpose, such as establishing motive or intent. *See State v. Reynolds*, 765 N.W.2d 283, 289 (Iowa 2009). If the evidence is found to be relevant and material to a legitimate issue in the case other than the defendant's propensity for criminal conduct, a determination must be made as to whether the probative value of the evidence on the issue for which it is offered substantially outweighs the danger of unfair prejudice to the defendant. *Id.* In making its determination, the court considers the following factors,

> the need for the evidence in light of the issues and the other evidence available to the prosecution, whether there is clear proof the defendant committed the prior bad acts, the strength or weakness of the evidence on the relevant issues, and the degree to which the fact finder will be prompted to decide the case on an improper basis.

*State v. Taylor*, 689 N.W.2d 116, 124 (Iowa 2004).

2. *Testimony regarding defendant's alleged involvement in theft of tire and rim.* On cross-examination, defense counsel elicited from James Bellcock that when Bellcock reported the lawn mower stolen on April 6, 2007, he also reported a tire and rim were stolen from an old pickup truck parked outside the machine shed. Defense counsel further elicited testimony from Rex concerning an incident when she was traveling back

from Kansas with Barnes and their vehicle had a flat tire. According to Rex, the defendant called his nephew, Steven Graber, and suggested Graber go out to the Bellcocks' property and take a tire from out there. Graber, she testified, subsequently turned up with a tire. Rex testified that she could not recall whether this tire incident occurred before or after the trip to the pawnshop.[3] In closing argument, the State asserted that Barnes asked his nephew to steal a tire and rim for him.

On appeal, Barnes argues trial counsel was ineffective for failing to object to the presentation of this incident of alleged other bad acts. Specifically, Barnes contends the evidence supporting Barnes' involvement in the theft of the tire and rim was weak, it was not relevant, and it had a tendency to improperly influence the jury.

Clearly, the State's comment on Barnes' conduct in asking his nephew to steal a tire and rim for him was an allegation of other bad acts. In this case, however, it is undisputed the defense opened the door to this allegation during its cross-examination of witnesses Bellcock and Rex. Therefore, the question is not whether defense counsel was ineffective for failing to object to the State's argument, but whether defense counsel was ineffective in eliciting this evidence in the first place. *See, e.g., State v. Carey,* 709 N.W.2d 547, 553 (Iowa 2006) (noting that, "[w]hile evidence of prior crimes is generally inadmissible under [our rules of evidence], the 'invited error' doctrine entitles the government to pursue inquiry into a matter, if evidence thereon was first introduced by [the] defendant").

The State suggests defense counsel made a reasonable strategic decision to elicit evidence of the theft of the tire and the defendant's request

---

[3]On direct examination, Rex testified that, after she, Barnes, and Sayer left the pawnshop on April 4, 2007, they had a flat tire. She further testified that a man named Paul showed up, after a call from Sayer, with a tire he had bought.

to his nephew. Based upon defense counsel's opening statement, the State surmises counsel was attempting to establish that other people were aware of the property on the acreage and had a motive for stealing it. The State contends that, although ultimately unsuccessful, it was a reasonable strategy given the strong evidence against the defendant.

" '[C]laims of ineffective assistance involving tactical or strategic decisions of counsel must be examined in light of all the circumstances to ascertain whether the actions were a product of tactics or inattention to the responsibilities of an attorney guaranteed a defendant under the Sixth Amendment.' " *Anfinson v. State*, 758 N.W.2d 496, 501 (Iowa 2008) (quoting *Ledezma v. State*, 626 N.W.2d 134, 143 (Iowa 2001)). We conclude an additional factual record, providing trial counsel an opportunity to address this issue, is necessary. Therefore, we preserve defendant's claim of ineffective assistance of counsel for postconviction relief. *State v. Johnson*, 784 N.W.2d 192, 198 (Iowa 2010).

3. *Defendant's statement regarding desire to burn down his sister's house.* On direct examination, the prosecutor asked Rex what Barnes had to say about his sister. In response, Rex answered, "Not very good things." On further probing by the prosecutor, Rex stated Barnes told her about the pigs he had been raising and that he wasn't very happy that his sister had sold them. She stated "he acted real mad about it." She also testified that a couple of times, before the lawn mower was stolen, Barnes remarked to the effect that "if he could he'd burn [his sister's] house down." The prosecutor, in closing argument, mentioned Barnes' desire to see his sister's house burned down as an indication of the defendant's motive.

Barnes claims trial counsel was ineffective for failing to object to the introduction of testimony regarding Barnes' threat of arson. This argument is without merit. First, the defendant mischaracterizes the testimony.

According to Rex, Barnes did not threaten literally to burn down his sister's house. He merely stated that "if he *could*," he would. There was no indication his remarks were other than rhetorical in nature, a venting of his anger toward his sister. Second, as the State pointed out in its closing argument, defendant's remarks were important to show the relationship between the defendant and his sister. The defendant was angry at his sister for selling his pigs without his knowledge, he felt she owed him, and he wanted to get back at her. One way to do this would be to steal her lawn mower. Thus, the evidence was probative of a material issue in the case, the defendant's motive to deprive his sister of her property. The probative value of the testimony was not substantially outweighed by the danger of unfair prejudice to the defendant, as there was no evidence the defendant was threatening to actually burn down his sister's house. From the testimony, a reasonable jury would understand the defendant's comments were his way of expressing his anger at his sister. We conclude, therefore, that this evidence was admissible, and any objection by counsel to its admission would have been futile. Consequently, counsel did not breach a duty in failing to object to it. *See State v. Horness*, 600 N.W.2d 294, 298 (Iowa 1999) (stating counsel is not ineffective for failing to make an objection that has no merit).

## IV. Reasons for Consecutive Sentences.

Barnes was sentenced to two indeterminate fifteen-year sentences to be served consecutively. Barnes asserts the trial court erred in failing to give reasons for the sentences to be ordered consecutively.

We review the district court's sentence for an abuse of discretion. *State v. Evans*, 672 N.W.2d 328, 331 (Iowa 2003). An abuse of discretion is found when the court exercises its discretion on grounds clearly untenable or to an extent clearly unreasonable. *State v. Laffey*, 600 N.W.2d 57, 62

(Iowa 1999). Our rules of criminal procedure require a sentencing judge to state the reasons for a particular sentence on the record. *See* Iowa R. Crim. P. 2.23(3)(d) ("The court shall state on the record its reason for selecting the particular sentence."); *see also State v. Johnson*, 445 N.W.2d 337, 342–43 (Iowa 1989). This requirement includes giving reasons for imposing consecutive sentences. *Evans*, 672 N.W.2d at 331–32; *State v. Jacobs*, 607 N.W.2d 679, 690 (Iowa 2000). "Although the reasons need not be detailed, at least a cursory explanation must be provided to allow appellate review of the trial court's discretionary action." *Jacobs*, 607 N.W.2d at 690.

A review of the sentencing transcript reveals the sentencing court gave sufficient and thoughtful consideration to the defendant's sentences. The court discussed at length the reasons for its selection of the sentence it was about to issue. Specifically, the court noted the defendant's long criminal history, the majority of which dealt with crimes involving the taking of other people's property, burglary, and going places where it was illegal for him to go; his lack of any real work experience; and the court's belief the defendant just did not "get it," had no understanding of the rehabilitation process, and did not understand that he was not supposed to take other people's property. The court then concluded that the best way to assist the defendant and to protect society was to "take him out of society and remove him . . . [so that] he's not going to be taking other people's property." The court concluded by stating, "So the best way, Mr. Barnes, that I can assist you, the best way I can assist the public and protect society, is the sentence that I am going to now give to you." The court then proceeded to order the defendant to serve fifteen years on each of the two counts and ordered the sentences to be served consecutively. The court's reasons for ordering consecutive sentences were clearly expressed in its overall explanation for the sentence it imposed. *See State v. Keopasaeuth*, 645 N.W.2d 637, 642

(Iowa 2002); *State v. Jacobs*, 644 N.W.2d 695, 700 (Iowa 2001). The defendant's challenge to his sentence is without merit.

**V. Disposition.**

We vacate the decision of the court of appeals reversing the defendant's convictions for burglary and theft on the ground trial counsel was ineffective for failing to request a corroboration instruction and affirm the judgment of the district court.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.**